# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 16, 2014

Lyle W. Cayce
Clerk

————

No. 13-10619

————

CHARLES N. WARREN; ROBERT T. WARREN; ABDUL JAVEED; JOAN JAVEED,

Plaintiffs–Appellants,

v.

CHESAPEAKE EXPLORATION, L.L.C.; CHESAPEAKE OPERATING, INCORPORATED,

Defendants–Appellees.

————————————

Appeal from the United States District Court
for the Northern District of Texas

————————————

Before JONES, SMITH, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Charles Warren and Robert Warren brought suit against Chesapeake Exploration, L.L.C. and Chesapeake Operating, Inc. (collectively the Chesapeake Entities), claiming that they breached royalty provisions in oil and gas leases by deducting post-production costs from the sales proceeds of natural gas. The Javeeds (Abdul and Joan Javeed) later joined the suit, asserting similar claims. The plaintiffs appeal the district court's dismissal of the case for failure to state a claim. We affirm as to the Warrens' claims, but we modify the judgment as to the Javeeds' claims to dismiss without prejudice.

No. 13-10619

## I

Because we are reviewing the grant of a Rule 12(b)(6) motion to dismiss, we accept the following factual allegations from the complaint as true.[1] This case involves three oil and gas leases covering land in Texas. The plaintiffs, the lessors, originally entered into the leases with FSOC Gas Co. Ltd., as the lessee. FSOC assigned its interests in the leases to Chesapeake Exploration, which contracted with one of its affiliates, Chesapeake Operating, to drill and operate wells on the land covered by the leases. The wells produce natural gas and associated fluids. The plaintiffs maintain that the Chesapeake Entities have breached the leases by failing to comply with the lease provisions in calculating royalties. The plaintiffs contend that the Chesapeake Entities are not entitled to deduct certain post-production costs and expenses in calculating the amount of royalty that is due under the leases.

It is undisputed that in computing the plaintiffs' royalties, Chesapeake Exploration, the lessee, subtracted certain post-production costs. The Chesapeake Entities maintain that the leases permit them to do so.

Charles Warren and Robert Warren filed a complaint in federal district court against the Chesapeake Entities. They asserted breach of contract claims and alternatively sought an equitable accounting and disgorgement of all monies owed them. The complaint also included class action allegations on behalf of other royalty owners that have similar leases with Chesapeake.

Chesapeake moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6), addressing both the Warrens' individual claims and the class claims. Various proceedings not relevant to our disposition of the issues on appeal occurred in the district court. The Warrens were permitted to file a

---

[1] *See Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (citing *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)).

second amended complaint adding the Javeeds as plaintiffs and adding certain exhibits to the complaint.  Chesapeake was not opposed to the filing of a second amended complaint but asked the court to rule that its original motion to dismiss and associated briefing were not moot as to the Warrens' re-urged claims.  The district court agreed that the original motion to dismiss was not moot and granted that motion, dismissing with prejudice.  The district court's order dismissed the Javeeds' claims with prejudice as well.

In its opinion and order dismissing the case, the court stated it would refer to the three leases—Charles Warren's, Robert Warren's, and the Javeeds'—"as a single contract" because "the relevant contractual language is functionally equivalent in all three Lease Agreements."  The court characterized all three lease agreements as involving "amount realized at the well" royalty provisions.  The court held that since the leases contained "at the well" royalty provisions, under decisions of the Supreme Court of Texas in *Heritage Resources, Inc. v. NationsBank*[2] and *Judice v. Mewbourne Oil Co.*,[3] Chesapeake was authorized to make post-production deductions in determining the amount realized at the mouth of the well, despite the provisions in the Warrens' leases that the royalty would be free of certain post-production costs.  Accordingly, the court held the plaintiffs' claims were precluded as a matter of law, and dismissed the entire case with prejudice.  This appeal followed.

**II**

We review de novo a district court's dismissal under Rule 12(b)(6), accepting all well-pleaded facts as true and viewing those facts in the light

---

[2] 939 S.W.2d 118 (Tex. 1996).

[3] 939 S.W.2d 133 (Tex. 1996).

most favorable to the plaintiffs.[4] To survive a Rule 12(b)(6) motion to dismiss, plaintiffs must plead enough facts to state a claim for relief that is plausible on its face.[5]

In this diversity case, Texas law governs the interpretation of the plaintiffs' oil and gas leases,[6] and this court reviews a district court's interpretation of state law de novo.[7] Under Texas law, the question of whether an oil and gas lease is ambiguous is one of law for the court.[8] In construing an unambiguous lease, our task is to ascertain the parties' intentions as expressed in the lease.[9] We presume that the parties intended every clause to have some effect, and we give terms their plain and ordinary meaning unless the instrument reflects that the parties intended a different meaning.[10] Texas law requires us to enforce an unambiguous lease as written.[11]

### III

We first consider the Warrens' leases.  It is not entirely clear from the Second Amended Complaint (the live pleading in the district court) as to whom the gas has been sold or where the sales have occurred.  The Complaint alleges that Chesapeake Energy notified the Warrens in correspondence that the gas produced from the leases is sold at the wellhead, after field separation, to Chesapeake Energy Marketing, Inc.    It is    alleged    that    this    same

---

[4] *Doe*, 675 F.3d at 854 (citing *Dorsey*, 540 F.3d at 338).

[5] *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[6] *See H. E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 529 (5th Cir. 1998) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78-79 (1938)).

[7] *Am. Bankers Ins. Co. v. Inman*, 436 F.3d 490, 492 (5th Cir. 2006).

[8] *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009).

[9] *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005).

[10] *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).

[11] *Id.*

correspondence stated that all deductions that were made were for transportation incurred downstream of the point of sale. The Complaint then alleges that the Chesapeake Entities no longer rely on the argument that the post-production costs are incurred downstream of the point of sale but instead now contend that language in the leases addressing post-production costs is "mere surplusage."[12] The Chesapeake Entities assert in a footnote in their briefing in our court that Chesapeake Exploration sold the gas at the well to an affiliated company and that Chesapeake Exploration "paid royalty based on the full amount it realized at the well from its affiliated purchaser." However, the Chesapeake Entities accept the allegations in the plaintiffs' Complaint as true for purposes of the motion to dismiss. Considering those allegations in the light most favorable to the plaintiffs, the Complaint appears to allege that sales occurred downstream from the mouth of the well and that post-production costs incurred delivering the gas to that point of sale have been deducted in calculating royalty payments.

The relevant provisions in Chesapeake Exploration's leases with Charles Warren and Robert Warren are identical. Part of each lease is a pre-printed lease form that contains a royalty clause in which the royalty is based on the amount realized at the well for gas sold by Chesapeake Exploration:

> As royalty, Lessee covenants and agrees . . . (b) to pay Lessor for gas and casinghead gas produced from said land (1) when sold by Lessee, [22.5%] of *the amount realized by Lessee, computed at the mouth of the well . . . .*

Each of the Warrens' leases also has a typed addendum attached to the pre-printed form that addresses post-production costs and expenses:

---

[12] *See id.* (holding that clauses in oil and gas leases addressing post-production costs were "surplusage as a matter of law").

> Notwithstanding anything to the contrary, herein contained, all royalty paid to Lessor shall be free of all costs and expenses related to the exploration, production and marketing of oil and gas production from the lease including, but not limited to, costs of compression, dehydration, treatment and transportation. Lessor will, however, bear a proportionate part of all those expenses imposed upon Lessee by its gas sale contract to the extent incurred subsequent to those that are obligations of Lessee.

The addendum to the Warrens' leases further provides:

> It is expressly agreed that the provisions of this Exhibit shall super[s]ede any portion of the printed form of this Lease which is inconsistent herewith, and all other printed provisions of this Lease, to which this is attached, are in all other things subrogated to the express and implied terms and conditions of this Addendum.

The lessors fault the district court for its construction of the leases, asserting that "[i]t has become too easy for courts to avoid considering explicitly negotiated lease language and simply stamp it as '*See Heritage, Return to Sender*,' without opening the envelope. That is tantamount to what the district court did here." This criticism of the district court's decision is unfounded. It was not lost on the district court that if anything is clear from the many Texas decisions dealing with royalty provisions, it is that different royalty provisions have different meanings. The two cases on which the parties and the district court principally rely from the Supreme Court of Texas reflect this. In *Heritage Resources*, there were differing royalty provisions, though, in that particular case, the differences did not affect the ultimate outcome.[13] In *Judice*, there were three differing royalty provisions, and the outcome with

---

[13] *Id.* ("[T]he first lease is distinctly different from the others . . ." but "[t]he critical clause in all three leases is the requirement that Heritage pay the royalty interest owners their fractional interest of 'the market value at the well' of the gas produced.").

respect to each did depend upon the particular terms of the provision.[14]   A royalty provision's meaning must be obtained from all of its terms.

The district court recognized that *Heritage Resources* and *Judice* govern this case, not because either of those decisions established immutable rules for construing "at the well" royalty provisions but because those cases require careful examination of the various terms and phrases the parties use.  In *Heritage*, some of what the parties included in their agreement had little actual meaning.  In *Judice*, one of the division orders conflicted internally and was therefore ambiguous.  Both of these cases expressly recognize that parties may provide that royalty is to be based on an amount from which no post-production costs are to be deducted,[15] but the parties have not done so in the Warrens' leases.

The Warrens' leases provide in the pre-printed royalty clause that they are entitled to 22.5% "of the amount realized by Lessee, computed at the mouth of the well."   As the Warrens recognize in their brief, the term "amount realized" "require[s] measurement of the royalty based on the amount the lessee in fact receives under its sales contract for the gas."[16]  Had the lease provided only that the Warrens are to receive 22.5% of the amount realized by

---

[14] *Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 135-37 (Tex. 1996) (holding that "market value at the well" lease provision allowed the lessee to allocate to the lessor its proportionate share of the reasonable cost of post-production compression; that royalty provisions in division orders providing "[s]ettlement for gas sold shall be based on the gross proceeds realized at the well by you" was ambiguous because there was an inherent conflict between "gross proceeds" and "at the well"; and that another division order that based royalty "on the net proceeds realized at the well by you" expressly contemplates deductions for post-production costs).

[15] *Heritage*, 939 S.W.2d at 131 (OWEN, J., concurring) ("There are any number of ways the parties could have provided that the lessee was to bear all costs of marketing the gas.").

[16] *See Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 699 (Tex. 2008) ("'Proceeds' or 'amount realized' clauses require measurement of the royalty based on the amount the lessee in fact receives under its sales contract for the gas.") (citing *Union Pac. Res. Grp. v. Hankins*, 111 S.W.3d 69, 72 (Tex. 2003)).

Lessee, there would be little question that the Warrens would be entitled to 22.5% of the sales contract price that the lessee received, with no deduction of post-production costs. But that is not what the lease provides. There is a further proviso, which is that the amount realized is to be "computed at the mouth of the well." This quantification of what the royalty shall be applies to all gas sold by the lessee, regardless of whether the gas is sold at the mouth of the well, off the leased premises, or at some point in between. The phrase "amount realized by Lessee, computed at the mouth of the well" means that the royalty is based on net proceeds, and the physical point to be used as the basis for calculating net proceeds is the mouth of the well. As the Supreme Court of Texas recognized in *Judice*, "the phrase 'net proceeds' contemplates deductions."[17] Absent the addendum to the leases, Chesapeake Exploration was entitled to deduct from sales proceeds the reasonable cost of post-production costs incurred in delivering marketable gas from the mouth of the well to the actual point of sale. We must therefore determine what effect, if any, the addendum had.

The addendum provides that if any portion of the pre-printed lease, which contains a royalty clause, is "*contrary*" to or "*inconsistent*" with the addendum, then the addendum supersedes the printed portion of the lease. Based on the method of calculating royalty specified in the pre-printed lease form, all royalty, regardless of where the gas sales occur, is free of post-production costs such as compression, dehydration, treatment, and transportation. That is because "the amount realized by Lessee, computed at the mouth of the well" necessarily excludes such costs. The addendum is not inconsistent with the royalty clause in the pre-printed lease. It says that "all

---

[17] *Judice*, 939 S.W.3d at 136 (citing *Martin v. Glass*, 571 F. Supp. 1406, 1411-15 (N.D. Tex. 1983), *aff'd*, 736 F.2d 1524 (5th Cir. 1984)).

royalty paid to Lessor shall be free of all costs and expenses . . . including, but not limited to, costs of compression, dehydration, treatment and transportation." The addendum does not change the point at which all royalty is computed, which is the mouth of the well. If the parties intended for the lessor to receive 22.5% of the proceeds of sales, regardless of where the sales occurred, they could have accomplished that end by any number of ways.[18] They could have deleted the phrase "computed at the mouth of the well." They could have said in the addendum that the lessor was entitled to 22.5% of the actual proceeds of the sale, regardless of the location of the sale. They did not.

The Warrens acknowledge that the first sentence in the addendum addressing post-production costs is functionally equivalent to the "no deductions" clause in *Heritage* and does not accomplish the result they desire. They assert that the addition of the second sentence—"Lessor will, however, bear a proportionate part of all those expenses imposed upon Lessee by its gas sale contract to the extent incurred subsequent to those that are obligations of Lessee"—makes their leases distinguishable from *Heritage*. More specifically, the Warrens contend, the addition of the second sentence establishes that there were two sets of obligations: (1) those obligations that were the sole responsibility of Chesapeake Exploration under the first sentence (exploration, production, and marketing of gas, including costs of compression, dehydration, treatment, and transportation), and (2) certain shared obligations under the second sentence (any costs incurred subsequent to Chesapeake Exploration's performance of (1)). The Warrens argue that the Chesapeake Entities

---

[18] *See Heritage*, 939 S.W.2d at 131 (OWEN, J., concurring) ("If [the parties] had intended that the royalty owners would receive royalty based on the market value at the point of *delivery or sale*, they could have said so. If they had intended that *in addition to* the payment of market value at the well, the lessee would pay all post-production costs, they could have said so. They did not.") (emphasis in original).

deducted expenses, such as costs in transporting the gas to the point of sale, which fall within the first set of obligations, and thus were the sole responsibility of the Chesapeake Entities and should not have been deducted from their royalty.

Though the language of the sentence at issue is somewhat confusing, we cannot ascribe the meaning to the sentence that the Warrens seek. The sentence provides "Lessor will, however, bear a proportionate part of all those expenses imposed upon Lessee by its gas sales contract to the extent incurred subsequent to those that are obligations of Lessee." We must decipher what expenses "incurred subsequent to those that are obligations of Lessee" means. Under the royalty clause in the pre-printed lease, the lessee bears the expenses of producing and selling the gas at the mouth of the well. Its obligation with respect to royalty is to pay the amount of proceeds computed at the mouth of the well, which means proceeds net of reasonable post-production costs incurred beyond the mouth of the well. Nothing in the first sentence of the addendum changes that obligation, as discussed above. To the extent that a gas sale contract requires the lessee to bear the cost of delivering marketable gas to a sales point other than the mouth of the well, the second sentence expressly provides that the lessor will bear a proportionate part of all those expenses.

The Warrens rely on a recent Texas court of appeals decision in *Chesapeake Exploration, L.L.C. v. Hyder*.[19] The royalty clause at issue in that case is different from the Warrens' as are the facts of *Hyder*. First, the Texas court treated three affiliated Chesapeake entities interchangeably without discussion.[20] There was no indication that any of the affiliated entities objected

---

[19] 427 S.W.3d 472, 476 (Tex. App.—San Antonio 2014, pet. filed).

[20] *See Hyder*, 427 S.W.3d at 475-78.

No. 13-10619

to the court's analysis in this regard, apparently due to the terms of the royalty provision. The royalty clause provided that the gas royalty was based on "the price actually received" by Chesapeake for the gas, and the parties agreed that post-production costs and expenses "incurred between the wellhead and [appellant's] point of delivery or sale of such share to a third party" could not be deducted.[21] The parties in *Hyder* stipulated that Chesapeake "incurred unaffiliated third party transportation costs of $1,750,000 allocable between the point of delivery and the point of sale."[22] The court held that Chesapeake could not deduct post-production costs incurred between the well and the point of sale in calculating the gas royalty.[23] The language of the gas royalty provision in *Hyder* differs markedly from the Warrens' royalty provision, and *Hyder* does not control this case.

We conclude that the district court did not err in dismissing the Complaint with prejudice. We note that the parties have not argued or briefed, and this opinion does not consider, the relationship among affiliated Chesapeake entities or the impact, if any, that relationship might have on matters at issue regarding the payment or calculation of royalties. We consider only the live complaint and attachments that were before the district court.

## IV

The third lease at issue in this appeal, between Chesapeake and the Javeeds, provides in paragraph 3 of the pre-printed lease form that: "As royalty, Lessee covenants and agrees . . . (b) to pay Lessor for gas and casinghead gas produced from said land (1) when sold by Lessee, 20% of the

---

[21] *Id.* at 476 (alteration in original).

[22] *Id.*

[23] *Id.* at 477-78.

amount realized by Lessee, computed at the mouth of the well . . . ." An Exhibit attached to the lease provides:

> Notwithstanding any of the provisions contained in the oil and gas lease to which this exhibit is attached, the following provisions shall apply:
>
> 13. The royalties to be paid by lessee are: . . . (b) on gas, including casinghead gas or other gaseous substances produced from said land or sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the point of sale of 20% of the gas so sold or used. However, in no event shall the royalty paid to Lessor be less than the Lessor's royalty share of the actual amount realized by the lessee from the sale of oil and/or gas. Notwithstanding anything to the contrary herein contained, all royalty paid to Lessor shall be free of all costs and expenses related to the exploration, production and marketing of oil and gas production from the lease including, but not limited to, costs of compression, dehydration, treatment and transportation. Lessor will, however, bear a proportionate part of all those expenses imposed upon Lessee by its gas sale contract to the extent incurred subsequent to those that are obligations of Lessee.

The Javeeds and the Warrens filed a joint initial brief in our court. That briefing did not fully quote the provisions of the Javeeds' lease. It made no mention of the provision that royalty to be paid is "the market value at the point of sale of 20% of the gas so sold or used." The Javeeds' royalty provisions differ substantially from the Warrens' royalty provisions. Nevertheless, the briefing is based on the Warrens' royalty provisions. The arguments in the initial briefing do not address the Javeeds' differing provisions. The district court treated the Warrens' leases and the Javeeds' lease as "functionally equivalent," and the plaintiffs' opening brief before this court did the same. It was not until the plaintiffs' reply brief in this court that the Javeeds asserted that their lease was meaningfully different than the Warrens' leases. The reply brief also argued, for the first time on appeal, that Chesapeake did not

No. 13-10619

move to dismiss the Javeeds' claims at all.  Arguments raised by appellants for the first time in reply briefs are waived.[24]  Accordingly, because the only contention raised by the Javeeds in the opening brief are the same contentions raised by the Warrens, we do not consider the argument the Javeeds presented in the reply brief.

We conclude, however, that the Javeeds' claim should not have been dismissed with prejudice.  It is not apparent from the face of the complaint or its attachments that they could not conceivably state a cause of action.

\*     \*     \*

The judgment of the district court is AFFIRMED as to the Warrens' claims.  The judgment of the district court is MODIFIED as to the Javeeds' claims to a dismissal without prejudice.

---

[24] *Valle v. City of Hous.*, 613 F.3d 536, 544 n.5 (5th Cir. 2010) (holding that the appellants waived an argument by failing to raise it in their opening brief).

13