# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 12, 2024

Lyle W. Cayce
Clerk

————————

No. 22-20226

————————

ANNE CARL, *as Co-Trustee of* THE CARL/WHITE TRUST, *on behalf of itself and a class of similarly situated persons*; ANDERSON WHITE, *as Co-Trustee of* THE CARL/WHITE TRUST, *on behalf of itself and a class of similarly situated persons*,

*Plaintiffs—Appellants*,

*versus*

HILCORP ENERGY COMPANY,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-2133

———————————————————————

Before DENNIS, ELROD, and HO, *Circuit Judges*.

PER CURIAM:[1]

In this mineral royalty dispute, the lessors appeal the district court's dismissal of their claim that the lessee must pay royalties on gas used off-lease for post-production services like transport and processing. Because we

———————————————————

[1] Judge Dennis concurs only in the decision to certify the questions to the Supreme Court of Texas.

No. 22-20226

cannot confidently make an *Erie* guess on this issue that is likely to recur, we CERTIFY two questions to the Supreme Court of Texas.

I

Anne Carl and Anderson White, as trustees of the plaintiff Carl/White Trust, and defendant Hilcorp Energy Company are successors in interest to a mineral lease that governs at least two wells in Brazoria County, Texas. Under this lease, Hilcorp must pay royalties to the Trust "on gas . . . produced from said land and sold or used off the premises . . . the market value at the well of one-eighth of the gas so sold or used." Hilcorp also "shall have free use of . . . gas . . . for all operations hereunder."

The Trust filed a class action complaint on behalf of royalty owners with similar leases alleging that Hilcorp failed to pay royalties on gas used in off-lease post-extraction processing services, such as compression and dehydration, necessary to make the gas saleable, commonly referred to as "post-production costs." *See Burlington Res. Oil & Gas Co. LP v. Texas Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2019). The Trust's complaint asserted that two provisions of the mineral lease entitle it to royalties on gas used off-lease for post-production costs. The off-lease clause requires Hilcorp to pay royalties for gas "sold or used off the premises," and the free-use clause provides for the free use of gas, but only when used for "operations" on the lease premises. The Trust asserted in its complaint that the off-lease clause expressly requires Hilcorp to pay royalties on gas "used off the premises" and the free use clause, by providing for free use of gas on-lease, impliedly excludes the possibility of free use of gas off-lease.

Hilcorp moved to dismiss the Trust's complaint for failure to state a claim, arguing that the lease calculates royalties based on the market value at the well, a value which necessarily excludes any gas used in post-production costs. The district court agreed, observing that the market value at the well

2

clause was the "critical clause in interpreting the lease agreement at issue." Applying the "workback method" recognized under Texas law, the district court found that post-production costs would be deducted from the Trust's royalty calculation. Because the complaint only alleged unpaid royalties on these deductions, the district court reasoned that the Trust sought royalties to which it was not entitled under the lease. The court granted the motion to dismiss. It did so without prejudice, however, and granted the Trust leave to amend its allegations of off-lease use for non-post-production purposes. The Trust filed a Second Amended Complaint with the new assertion that: "Gas that is not sold, but is used off the lease, can be and is used for many purposes and locations and never reaches a point of sale." The district court dismissed this complaint as well, determining that the Trust's vague amendment failed to allege with specificity any off-lease gas used in non-post-production activities, and that the complaint otherwise failed for the same reasons provided in the court's earlier order. The Trust's complaint was dismissed with prejudice. The Trust timely appealed.

## II

"We review de novo a district court's dismissal under Rule 12(b)(6), accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs. To survive a Rule 12(b)(6) motion to dismiss, plaintiffs must plead enough facts to state a claim for relief that is plausible on its face." *Warren v. Chesapeake Expl., L.L.C.*, 759 F.3d 413, 415 (5th Cir. 2014) (citations omitted). In this Class Action Fairness Act diversity case, *see* 28 U.S.C. § 1332(d), "Texas law governs the interpretation of the plaintiffs' oil and gas leases, and this court reviews a district court's interpretation of state law de novo." *Warren*, 759 F.3d at 415 (citations omitted).

### III

We begin with some background.  Gas production is the process of bringing raw gas to the surface.  *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 386 (Tex. 2021) (citing 8 Williams & Meyers Oil and Gas Law, Manual of Oil & Gas Terms, at 833 (2020)).  "A royalty payment, which represents a lessor's fractional share of production from a lease, may be calculated at the wellhead or at any downstream point, depending on the lease terms.  Gas royalties are generally free of the expenses incurred to extract raw gas from the land (production costs) but not expenses incurred to prepare raw gas for downstream sale (postproduction costs).  Because mineral leases are contracts, these general rules may be modified as the parties see fit."  *Id.* at 387 (citations omitted).

Royalty clauses typically have three components: "(i) the royalty fraction—e.g., 1/8th, 25%, 1/5th; (ii) the yardstick—e.g., market value, proceeds, price; and (iii) the location for measuring the yardstick—e.g., at the well, at the point of sale."  *BlueStone Nat. Res. II, LLC v. Randle*, 601 S.W.3d 848, 856 (Tex. App.—Forth Worth 2019) (citing Byron C. Keeling, *In the New Era of Oil & Gas Royalty Accounting: Drafting a Royalty Clause That Actually Says What the Parties Intend It to Mean*, 69 Baylor L. Rev. 516, 520 (2017)), *aff'd in part, rev'd in part on other grounds*, 620 S.W.3d 380 (Tex. 2021).  The royalty clause in the Trust's lease provides the Trust with a royalty of 1/8 of the market value at the well of all gas sold or used off the premises.  Following the taxonomy above, its components are (i) 1/8 (ii) of the market value (iii) measured at the well.

The market value of gas is typically lower at the wellhead than it is at a downstream point of sale.  This is because "[a]n arm's length purchaser typically will pay more for oil and gas that the lessee has already transported to a downstream market and compressed, processed, treated, and otherwise

made ready for a downstream sale." Keeling, *supra*, at 525; *see also Devon Energy Prod. Co., L.P. v. Sheppard*, 668 S.W.3d 332, 336 (Tex. 2023) ("These investments generally make production more valuable."). Thus, the standard interpretation of a market value at the well provision in a mineral lease is that it "means value at the well, net of any value added . . . after [the gas] leaves the wellhead." *Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 135 (Tex. 1996); *see also Chesapeake Expl., L.L.C. v. Hyder*, 483 S.W.3d 870, 873 (Tex. 2016) ("The market value at the well should equal the commercial market value less the processing and transporting expenses that must be paid before the gas reaches the commercial market.").

In a royalty dispute, it is the royalty owner's burden to prove the market value at the well. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 122 (Tex. 1996). In Texas there are two accepted methods to determining market value at the well. *Id.* The preferred is the "comparable sales" method, which uses "actual sales that are 'comparable in time, quality, quantity, and availability of marketing outlets.'" *Randle*, 620 S.W.3d at 388 (quoting *Heritage Res.*, 939 S.W2d at 122). The second is the "workback method," which is used when comparable sales data is unavailable. *Id.* at 388–89. This method estimates the wellhead value by deducting post-production costs from the proceeds of downstream sale. *Id.* "Although parties to an agreement may define post-production costs any way they choose, the term generally applies to processing, compression, transportation, and other costs expended to prepare raw oil or gas for sale at a downstream location." *Burlington Res.*, 573 S.W.3d at 203. Consistent with the notion that a mineral's value at the wellhead is less than its value after being transported, processed, and prepared for market, the workback method allows the lessee to subtract these value-enhancing, post-production costs to estimate the worth of the mineral before those services were rendered. Keeling, *supra*, at 532. "[W]hile the comparable sales method is

the preferred way of calculating the wellhead value of oil and gas production, the vast majority of lessees do not use—and have never used—the comparable sales method to calculate their royalty payments. This is true, as a practical matter, because wellhead sales of oil and gas have become increasingly less common since the early 1990s." *Id.* at 531.

Where comparable sales allegations are not pleaded or proven, Texas courts have consistently applied the workback method to calculate royalties based on market value at the well. *See Heritage Resources*, 939 S.W.2d at 123 ("Because there is no evidence to support the comparable sales method of computing market value at the well, we use the [workback] method."); *Occidental Permian Ltd. v. French*, 391 S.W.3d 215, 222 (Tex. App.—Eastland 2012) ("Having concluded that no evidence exists to support the trial court's [comparable sales] determination of market value at the well, we next must examine whether that value is supported by evidence under the [workback] method."); *see also Randle*, 620 S.W.3d at 388 ("When comparable sales data is unavailable, an alternative methodology for determining 'market value' at a specified valuation point is the . . . 'workback' method."); *Potts v. Chesapeake Expl., L.L.C.*, 760 F.3d 470, 475 (5th Cir. 2014) ("The deduction of post-production costs incurred between the wellhead and a downstream point at which market value could be ascertained was nothing more than a method of determining market value at the well in the absence of comparable sales data at or near the wellhead."). Thus, the workback method, while not preferred when the comparable sales method is available, is nonetheless a perfectly adequate "proxy" for the lease term "market value at the well" when the comparable sales method is unavailable. *Randle*, 620 S.W.3d at 389.

IV

The parties dispute whether, under the workback method, the lessee must pay royalties on gas used off-lease as part of the post-production

process. The off-lease clause requires Hilcorp to pay royalties for gas "sold or used off the premises," and the free-use clause provides for the free use of gas, but only when used for "operations" on the lease premises. The district court held that these provisions did not preclude lessees from deducting gas used as fuel during post-production or as in-kind payment for post-production services from the amount of gas on which royalties were owed.

The Trust argues that, under the Supreme Court of Texas's recent decision in *Randle*, the lease's market value at the well provision does not limit or affect the off-lease and free-use clauses, which clearly entitle it to royalties on gas used off-lease. The Trust further argues that even if such gas can be deducted, the deduction can only be applied to the value per unit of gas. It cannot reduce the number of units of gas on which royalties must be paid. Hilcorp contends that, as the district court held, *Randle* is inapplicable because it concerned a gross-value-received lease, rather than a value-at-the-well lease. While *Randle* does concern a different type of lease, the section of that opinion addressing the free-use clause can be read to address free-use clauses generally. This raises the question of whether the free-use clause here, when read in conjunction with the rest of the lease, permits deduction of gas used off-lease for post-production purposes. The uncertainty about *Randle*'s effect raises the question of whether the appropriate course is to certify the issue for resolution by the state court of last resort. It also raises the question of how a potential deduction should be applied.

The Texas Rules of Appellate Procedure authorize the Supreme Court of Texas to "answer questions of law certified to it by any federal appellate court if the certifying court is presented with determinative questions of Texas law having no controlling Supreme Court precedent." Tex. R. App. P. 58.1. The issues presented here satisfy that condition. The issues presented also satisfy the three factors we use in deciding whether to certify:

No. 22-20226

1) [T]he closeness of the question and the existence of sufficient sources of state law;

2) [T]he degree to which considerations of comity are relevant in light of the particular issue and case to be decided; and

3) [P]ractical limitations on the certification process: significant delay and possible inability to frame the issue so as to produce a helpful response on the part of the state court.

*In re Gabriel Inv. Grp.*, 24 F.4th 503, 507 (5th Cir. 2022). The circumstances here strongly support certification. "[A]ny *Erie* guess would involve more divining than discerning." *McMillan v. Amazon.com, Inc.*, 983 F.3d 194, 202 (5th Cir. 2020). *Randle* is a recent case, and we are not aware of any opportunity that Texas courts have had to address whether its free-use analysis applies to value-at-the-well leases. The parties cite several cases in support of their respective positions, but the Texas cases precede *Randle* and the federal cases, while careful and thoughtful, are *Erie* guesses about what the Supreme Court of Texas would do. Accordingly, the cited cases do not provide sufficient guidance as to Texas law on these issues. Comity interests also favor certification, as the interpretation of mineral leases are an important and significant part of Texas state law. Finally, we are not aware of any practical impediments to certification.

\* \* \*

Accordingly, we CERTIFY the following determinative questions of law to the Supreme Court of Texas:

1) After *Randle*, can a market-value-at-the well lease containing an off-lease-use-of-gas clause and free-on-lease-use clause be interpreted to allow for the deduction of gas used off lease in the post-production process?

2) If such gas can be deducted, does the deduction influence the value per unit of gas, the units of gas on which royalties must be paid, or both?

8

No. 22-20226

We disclaim any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the questions certified. We will resolve this case in accordance with any opinion provided on these questions by the Supreme Court of Texas. The Clerk of this Court is directed to transmit this certification and request to the Supreme Court of Texas in conformity with the usual practice.

QUESTIONS CERTIFIED.